Fairchild, J.
1. Motion for dismissal of Associated. In 1951, Associated had on hand some government-surplus smocks of the surgical type, with high-fitting neck and sleeves. Kennedy-Ingalls bought these at 75 cents as follows : On March 6th — 3, on March 9th — 500, on April 9th — 526, and on April 26th — -11. Kennedy-Ingalls cut the smocks into aprons, and sold all but 40 or 50 to Smith. On September 23, 1952, Meissner sold 1,007 smocks to Kennedy-Ingalls at 60 cents each. The invoice named only Meissner (under his trade name) and Kennedy-Ingalls. These were in the possession of Associated, and were delivered from its establishment to Kennedy-Ingalls. They were invoiced to Meissner by Associated on September 24, 1952, at 50 cents per smock. Mr. Ingalls testified that aprons were cut from these smocks also, and sold to Smith. James was burned April 22, 1953, while wearing an apron similar to those cut by Kennedy-Ingalls from the government-surplus smocks. One of the issues at the trial was whether the apron worn by James was cut from a smock which came from Associated, and another issue was whether *377 Associated had any contractual responsibility to KennedyIngalls with respect to the smocks purchased September 23, 1952.
The circuit court very carefully prepared a form of special verdict to resolve with precision the many issues in the case. The first two questions were as follows:
“Was the apron worn by George James at the time of his accident one of the aprons sold to the plaintiff by the defendant, Associated Sales & Bag Company ?
“Was the apron worn by George James at the time of his accident one of the aprons sold to the plaintiff by the defendant, Roland E. Meissner?”
The court instructed the jury that if it answered either of these questions “Yes,” it need not answer the other. Negative answers to both would be a finding that the apron in question coitld not be traced to either defendant. An affirmative answer to either would establish that the apron originated from one of the smocks formerly in the possession of Associated, and would also establish whether it was sold to Kennedy-Ingalls in a sale in which Associated was admittedly a principal, or in the 1952 sale as to which there was a dispute concerning the participation of Associated as principal.
The jury answered “Yes,” to the second question and did not answer the first. Associated contends that the failure to answer the first question was a finding that it did not sell the smocks to Kennedy-Ingalls, and that it was entitled to a dismissal. Under the instructions of the court, the failure to answer cannot be so construed.
2. Evidence to support finding of agency. Associated contends that the evidence does not support the jury’s finding that Meissner was the agent of Associated at the time of the sale in September of 1952. There was evidence that in the ordinary course of dealing between them, Meissner’s activities were not subject to control by Associated. He *378 would find a buyer for goods which Associated had for sale, and would buy from Associated after he made a sale to another. Instead of paying Meissner a commission, Associated would sell to Meissner at a price lower than Meissner’s price to the third party. It is claimed that Meissner was an independent contractor in the sale of the smocks.
There is evidence, however, from which it could be inferred that he acted as agent, at least in the sale of these smocks. Mr. Rubenstein, the president of Associated, answered on adverse examination before trial that Meissner was one of Associated’s agents, although he then described the course of dealing previously related. Evidently the sales in March and April, 1951, exhausted Associated’s supply of the smocks. Associated bought more of them, and attempted unsuccessfully to sell them to Kennedy-Ingalls. On adverse examination, Mr. Rubenstein testified that when he was not able to sell Ingalls the last lot of aprons, he got Meissner to help him; that he sent Meissner over to sell the aprons to Ingalls; that after Meissner had reported he had sold them to Ingalls, Associated billed Meissner, and Meissner billed Ingalls, and the merchandise went directly from the Associated’s stock room to Ingalls. Meissner testified that Rubenstein showed him one of the smocks, and asked him to try to sell the thousand smocks then on hand to Ingalls. Meissner called on Ingalls several times, and ultimately made the sale. Ingalls testified that he declined to pay the price Meissner was asking. Meissner asked what Ingalls would give. Ingalls said he would not give more than 60 cents apiece. Meissner then left, saying: “No we won’t take it.” The next morning Meissner came back and said Ingalls could have the smocks at 60 cents.
We conclude that the jury could properly draw the inference that with respect to these smocks, at least, there was a manifestation of consent by Associated to Meissner *379 that he act on its behalf and subject to its control, and consent by Meissner so to act. Georgeson v. Nielsen (1934), 214 Wis. 191, 196, 252 N. W. 576; Restatement, 1 Agency (2d), p. 7, sec. 1 (1).
3. Finding that smocks were not of merchantable quality. Although defendants attack the sufficiency of evidence to support this finding, it is unnecessary to discuss this point because of our conclusions with respect to implied warranty of fitness and express warranty of quality.
4. Sufficiency of evidence to support findings with respect to breach of implied warranty of fitness and of express warranty. The claimed implied warranty is that the smocks were fit for use for industrial purposes after being cut into aprons. The claimed express warranty is that the material of which they were made was of equal or superior quality to the material which Kennedy-Ingalls was then using for aproñs for industrial purposes. The issues with respect to the implied and express warranties are, of course, not identical, but under the facts presented by this evidence they are so closely related that we discuss them together.
Mr. Ingalls has been in the business of selling certain items of safety equipment to industrial users since 1942. At first he sold industrial caps for women, later rubber gloves, and after 1948 aprons and other garments. Associated primarily processes cotton and burlap bags, but has sold various types of industrial fabrics and materials for twenty years. Mr. Rubenstein has always been president. Ingalls and Ruben-stein have done business since 1945. Meissner had been a manufacturer of coats for thirty years, but became a manufacturer’s agent in January, 1952. He and Ingalls had been acquainted for several years, and in 1952 he called upon Ingalls every three or four weeks. There is evidence that both Meissner and Rubenstein knew what materials Ingalls used for industrial aprons.
*380 In March, 1951, Rubenstein showed Ingalls a smock, showed him it could be cut into an apron, and said it would be equal to the material Ingalls was using, and would be very acceptable for industry. Ingalls took three smocks and determined that he could cut them into aprons of the required size, and that they would not become saturated when water and oil were spilled on them. He made no other tests. Ingalls then bought a number of the smocks. Rubenstein called on later occasions, attempting to sell more, and repeated they were equal to the other materials Ingalls was using for industrial aprons.
In September, 1952, Meissner came to the KennedyIngalls establishment. There was evidence that he was in the cutting room on several occasions, and observed the material Kennedy-Ingalls was using for aprons. Meissner said the smocks were of excellent quality, and equal to the material Kennedy-Ingalls was then using. Ingalls recognized the smock Meissner had with him as being similar to those Ingalls had bought from Associated. Although Meissner denied it, Ingalls was sure that it came from there.
After James was burned and claimed damages from Kennedy-Ingalls, it was learned that the smocks were coated with a substance known as pyroxylin, a plastic which is a mixture of two nitrocellulose compounds, and has very great flammability. Its presence cannot be determined except by chemical analysis. A letter from a commercial testing laboratory written to Kennedy-Ingalls concerning defense of the lawsuit brought by James was received in evidence without objection or limitation. After noting the presence of pyroxylin, the letter read in part:
“Quite frankly, there could not have been a more-inappropriate choice of material for welders aprons. The fact that these aprons were not designed for welding but for general utility is of some relief, but as far back as 1945 this material *381 was voluntarily banned from all apparel uses by a manufacturers association in the coated-fabrics field.
“As matters now stand from a summation of data in our report, the apron material, including the pyroxylin coating, meet the present federal requirements for wearing apparel as covered in Public Law 88. Conformance with the law does not, in our opinion, provide adequate fire protection for industrial aprons which may be used around heat and flame sources of greater intensity than those found in the home. Pyroxylin should not be used in wearing apparel and major suppliers in acknowledgment of this fact will not knowingly supply the material today for this use.”
There was expert testimony tending to show that the material in these smocks was substantially more flammable than other materials used by Kennedy-Ingalls for the manufacture of industrial aprons.
In the foregoing recitation of facts, we have considered disputed matters in the light most favorable to support the verdict.
The fact that the smocks were coated with pyroxylin, the unsuitability of that coating for use in industry generally, as appearing from the letter from the testing laboratory referred to, and the expert testimony as to flammability of the material are a sufficient basis for a finding that the smocks were not reasonably fit for use as aprons for industrial use. The evidence makes it sufficiently clear that Associated and Meissner both were informed as to the general purpose for which Kennedy-Ingalls was to sell the aprons. It is true that Ingalls, Rubenstein, or Meissner did not appear to have known whether the aprons would, or might be used by a welder, but it sufficiently appears that this material was not suitable for use for aprons in industry generally.
The evidence heretofore summarized also sufficiently supports the findings that Meissner and Associated asserted that the material in the smocks was at least equal to the *382 materials ordinarily used by Kennedy-Ingalls to make industrial aprons. The evidence also supports the finding that the material in the smocks was not, in fact, equal with respect to flammability.
Defendants argue that the statement was one of opinion and therefore not an express warranty under sec. 121.12, Stats. We conclude, however, that a statement that a material is of a quality equal to that of another material for the purpose of manufacture into a specified product is a statement of fact rather than opinion.
We now reach consideration of the jury findings that Kennedy-Ingalls relied on the skill or judgment of the seller, and that Kennedy-Ingalls relied upon the express warranty. The question whether the evidence sufficiently supports these findings is close. As suggested by counsel for defendants, Mr. Ingalls had very substantial experience in the manufacture of aprons for industrial use, and might from the evidence be considered to be better, or at least as well informed in that field as Rubenstein or Meissner. Kennedy-Ingalls first purchased smocks of the type involved here in 1951, and. more than a year elapsed before the purchase of more of them in September, 1952. Aprons had been cut out of the smocks purchased in 1951, and sold, and presumably used by purchasers without complaint that they were too flammable for such use. While Mr. Ingalls was evidently reluctant to make the purchase in 1952, it does not appear that he had any idea that the material was more flammable than others, and it could be reasoned that Mr. Ingalls was relying as much upon his own experience with these smocks as upon the representations made to him either by Mr. Rubenstein in 1951, or by Mr. Meissner in 1952. The record supports the inference, however, that highly insistent salesmanship was employed by Mr. Meissner in 1952, and that Mr. Ingalls was ultimately persuaded to buy by the repeated statements of Mr. Meissner as to *383 quality of the material. We thus conclude that the evidence presented an issue for the jury, both with respect to Ingalls’ reliance upon the judgment of Meissner and Rubenstein as required under sec. 121.15 (1), Stats., for an implied warranty of fitness, and upon the express warranties made as to quality.
5. Sufficiency of evidence to support finding of notice of breach of warranty. The accident to James occurred April 22, 1953. The amended complaint in the James action was served March 17, 1955. That action was settled May 14, 1956. Letters calling for reimbursement were sent by Kennedy-Ingalls to Associated and Meissner August 30, 1956. The issue as to timely notice, however, related to a conversation between Ingalls and Meissner in 1953. Ingalls testified that the conversation took place within a week after the accident and that, “I told him about the accident, that I had been called and told that a man wearing one of the aprons that was made from these aprons that I had bought from him had been severely burned, and that I was threatened with a lawsuit, there was a possibility of it, and that I would anticipate that they would share whatever there was to be, if there was a lawsuit, with me; that I might have to call on them for help.” Ingalls testified that he asked Meissner to talk to Mr. Rubenstein dbout it, and Meissner said he would.
Mr. Meissner testified that the conversation took place late in 1953; that Ingalls said: “I may have trouble because a man at A. O. Smith was burned, and if I have trouble, someone will have to pay for this.”
It is undisputed that Meissner told Rubenstein about the conversation with Ingalls, the fire, and that an apron was involved. The jury found that Meissner was the agent of Associated at the time of the conversation. The issue now is whether or not the conversation met the requirements of sec. 121.49, Stats., as to notice.
*384 “The statute does not require that the notice shall be in any particular form. It should fairly advise the seller of the defect asserted in the performance of a particular promise or sale; it should repel any inference of waiver, and at least by implication should assert that there has been a violation of the buyer's legal rights.” 3 Williston, Sales (rev. ed.), pp. 41, 42, sec. 484b. See Ace Engineering Co. v. West Bend Malting Co. (1943), 244 Wis. 91, 93, 11 N. W. (2d) 627; Arctic Engineering Corp. v. Harrison (1956), 272 Wis. 129, 136, 74 N. W. (2d) 627.
The jury could believe Ingalls' testimony that the conversation occurred within a week after the fire, and that that was a reasonable time after Ingalls knew, or ought to have known that the aprons were more flammable than such items should be. Ingalls' oral statement reasonably infoimied Meissner that Ingalls believed he was entitled to financial help with respect to legal claims arising out of the fire. While he did not appear to have described the specific defect in the materials which made them more flammable, it is reasonably clear that a defect of that type in the material would be the basis for his claim against Meissner and Associated. Here again the question is close for one may wonder why Ingalls was not more aggressive in seeking help, or keeping Meissner and Associated informed of developments during the pendency of the James lawsuit, and at the time that Ingalls settled it, but we conclude that the evidence did present an issue for the jury.
6. The circuit court refused to submit to the jury a question whether the sale was by sample. Defendants contend this was error. They point out that under sec. 121.16, Stats., there are certain implied warranties in the case of a sale by sample, and suggest that these are the only warranties which can be implied in such a sale. In view of the findings and our conclusions as to the breach of express warranty, it is unnecessary to consider whether there can be an im *385 plied warranty of fitness under sec. 121.15 (1) when there is a sale by sample.
7. Argument of counsel. The arguments of counsel were not recorded, but there is no dispute as to what was said in those portions which are challenged as improper and prejudicial.
Counsel for Kennedy-Ingalls suggested that the jury could conduct its own experiments in the jury room to determine the flammability of the material. Counsel for defendants objected. The court sustained the objection and at that time and later, in the general instructions, told the jury not to conduct any experiments of any kind. Counsel for defendants do not suggest how the argument could have had any prejudicial effect, and we see none.
Three attorneys appeared at the trial on behalf of one or both defendants. Mr. Klein was attorney of record for Associated, but not for Meissner. Mr. Rosenbaum was an attorney of record for Meissner, but not for Associated. Mr. Arnold appeared for both defendants, and virtually all the proceedings on behalf of the defense at the trial were conducted by Mr. Arnold.
Upon oral argument, counsel for Kennedy-Ingalls stated that the agency relationship between Meissner and Associated was indicated by the fact that both had the same attorneys. Defendants did not object. On motions after verdict, the circuit court was of the opinion that in arguing the issue of agency, there was no impropriety in calling the jury’s attention to the close relationship between the defendants indicated by the fact that one of the attorneys represented both of them. We agree, and conclude that defendants’ failure to object at the time of the argument would also be a sufficient reason for refusal to set aside a verdict.
The third portion of argument challenged could have affected nothing but one finding on damages. It is un *386 necessary to consider- it .because of our conclusion that there was no jury issue in that respect.
8. Contributory negligence. The gist of James’ claim against Kennedy-Ingalls was that Kennedy-Ingalls was negligent, especially in the light of its knowledge of operations at the Smith plant, in not testing apron material with respect to flammability before selling to Smith. Defendants now assert that if Kennedy-Ingalls was causally negligent as claimed by James, such negligence would be at least a partial defense in the present action. They suggest that if Kennedy-Ingalls had not been causally negligent, it would have discovered the danger, and would have had no greater right against defendants than to rescission of the sale or damages measured by difference in value.
Defendants did not plead that Kennedy-Ingalls had been negligent. They did request the circuit court to submit questions as to negligence, and did move for a new trial upon the ground that the court’s refusal was error.
In Schmidt v. Schabow (1953), 265 Wis. 154, 60 N. W. (2d) 735, there was a breach of warranty when defendant filling station operator failed to put oil in the crank case of plaintiff’s car. Plaintiff drove the car, noticed a noise, and continued to drive to another filling station. The motor was severely damaged. This court held that plaintiff’s continuing to drive after she discovered the noise presented an issue as to enhancement of damages but not contributory negligence. The same analysis might apply to the present claim except that the asserted negligence of Kennedy-Ingalls did not consist of an act or omission after discovering the high degree of flammability of the aprons, but of failure to detect the high flammability.
This court noted in Schmidt v. Schabow, supra, that the authorities are not in accord on a defendant’s duty to plead failure to mitigate damages. But in cases like these, whether plaintiff’s failure to exercise reasonable care be termed con- *387 tributary negligence or failure to mitigate damages, we now conclude that the defendant must allege such failure.
The rule with respect to pleading contributory negligence is stated as follows in 3 Callaghan’s, Bryant, Wisconsin Pleading and Practice (3d ed.), p. 436, sec. 21.28:
“Prior to the abolition of the general denial, contributory negligence did not need to be pleaded specially by way of defense and could be proven under a general denial. Now, of course, contributory negligence must be affirmatively alleged, except, however, where the plaintiff alleges that he was in the exercise of due care at the time he was injured, the issue of contributory negligence is said to be sufficiently raised by a specific denial that the plaintiff was exercising due care.”
The statement that the defense of contributory negligence is open to the defendant without pleading it in his answer in Arneson v. Buggs (1939), 231 Wis. 499, 286 N. W. 19, was based upon decisions when a general denial was permitted. See amendment of sec. 263.13, Stats., 204 Wis. p. vi, effective September 1, 1931. The statement in Arneson v. Buggs, supra, is withdrawn, and the rule above quoted is approved. See also Nelson v. Hansen (1960), 10 Wis. (2d) 107, 121, 102 N. W. (2d) 251. There is even more reason, in cases like Nelson v. Hansen, supra, and the one now before us, where plaintiff’s cause of action is not based on negligence, to require a defendant to plead contributory negligence if he wishes to rely upon it.
9. Amount paid in settlement. Kennedy-Ingalls offered in evidence the amended complaint and answer in the action brought by James. It also proved the terms of the settlement, approved as required by statute in such actions by the circuit court. Under these terms, Kennedy-Ingalls paid $17,500 to James, and James released Kennedy-Ingalls and the officers, agents,' and employees of Smith from liabilities arising out of the accidental fire. Smith released Kennedy *388 Ingalls from Smith’s claims on account of the injuries sustained by James, and Smith waived all its interest in the $17,500 paid to James. Kennedy-Ingalls released Smith, its officers, agents, and employees from any liabilities arising out of the accidental fire.
Mr. John, counsel who represented Kennedy-Ingalls in preparation for trial and in negotiating the settlement, testified concerning his investigations, and estimate of the risks of .the lawsuit. It was Mr. John’s opinion that James might recover between $50,000 and $75,000, and this estimate appears entirely reasonable in the light of James’ injuries, expenses, and disabilities as described. Mr. John considered that the probability that a jury would determine the liability issues in favor of James was about 50 per cent. He recommended the settlement to his client.
Defendants offered no evidence tending to show that the settlement was improvident, in any sense a gratuity, or unreasonable in amount. The only facts elicited in cross-examination which remotely suggested any of these things were: (1) That Mr. John was not retained for a substantial period after the action was commenced, and that material witnesses were not interviewed until then; (2) that Mr. John did not interplead several employees of Smith and allege they were negligent in permitting the apron to be issued to James; on this issue Mr. John explained that he was unable to determine facts which fixed liability on any particular employees of Smith; (3) Mr. John conceded that the thought of Kennedy-Ingalls’ future business relations with Smith was one of the factors which made up his composite judgment that the settlement was a good one. Pie was not asked any question which could reflect the amount, if any, paid by his client which it would not have paid but for this consideration.
When the case was submitted to the jury, KennedyIngalls took the position that the $17,500 paid in settlement *389 was established as an element of damages as a matter of law. The circuit court declined to insert the answer in the special verdict, and submitted the question with instructions that in arriving at the amount of damages with respect to the settlement, the jury should take into consideration all of the facts and circumstances appearing from the evidence. The jury’s answer to the question was $10,500 (60 per cent of $17,500). Upon motions after verdict, the court changed the answer to $17,500. We conclude that the circuit court was correct in ultimately ruling as a matter of law that $17,500 was to be included as damages. The proof offered by Kennedy-Ingalls amply made a prima facie case of payment in settlement of a dangerous claim, upon advice of counsel, at a figure, and under terms which appear reasonable to this court, and evidently did to the circuit court. The suggestions of defendants that a less amount might have sufficed if the witnesses had been interviewed somewhat earlier, or if different tactics had been employed, or if there had not been a business relationship between KennedyIngalls and Smith, are insufficient, in our opinion, to raise an issue of fact with respect to this element of damages.
10. Cost of aprons returned. After the fire, Smith returned the aprons on hand to Kennedy-Ingalls for credit. KennedyIngalls destroyed some, and retained others for use in connection with the lawsuit. It did not offer to return them to the defendants. The jury awarded damages of $582.60 for the aprons returned after the fire. This amount was equal to the price at which Kennedy-Ingalls bought. Defendants argue that there could be judgment for the purchase price only if there were rescission and a tender of the goods. There was, however, testimony from which the jury could find that the aprons were worthless after discovery of their pyroxylin coating. This sustains the finding that damages were equal to the purchase price.
*390 11. Expense of defense of James lawsuit. One question in the special verdict inquired the amount of damages with respect to attorneys’ fees and disbursements incurred by the plaintiff in connection with the defense of the James action.
Certain disbursements were proved and the parties apparently agreed that $2,370.91 had been spent, and was reasonable. The circuit court inserted this figure in the verdict. While considering motions after verdict, the court concluded upon its own initiative that Kennedy-Ingalls could not recover this expense because it had never tendered to Associated nor Meissner the defense of the James action.
There is authority which suggests, at least, that a tender of defense is a condition precedent to recovery of the expense of defense in similar situations.
“Where a vendee who has resold goods with a warranty similar to that made by his vendor is subjected to suit by the subvendee for breach of that warranty, he is entitled to be restored to the position he would be in if the vendor had not defaulted. Where he gives notice to the vendor to come in and defend that suit and the vendor fails to do so, the reasonable cost to the vendee of that defense in relief of the ultimate liability of the vendor should be recoverable by him. It is quite true that our jurisprudence does not recognize counsel fees incurred in an action as a recoverable item of damages in that action, and litigants must bear the expense. of counsel as an incident of establishing their legal rights. Where, however, as in the case at bar, the defense of an action by a party is undertaken for the protection of the person ultimately liable after he has had notice to undertake the defense but fails to do so, the reasonable costs of that defense should fall on him.” Robert A. Reichard, Inc., v. Ezl. Dunwoody Co. (D. C. Pa. 1942), 45 Fed. Supp. 153, 157. See also Consolidated Hand-Method Lasting Machine Co. v. Bradley (1898), 171 Mass. 127, 133, 50 N. E. 464, 467.
It could be argued, of course,' that where one in the position of Kennedy-Ingalls made reasonable disbursements *391 in defending itself from an asserted liability for negligence, and assuming, as is implicit in the findings and record in this case, that a claim of negligence .could not have been sustained if the goods involved were as warranted, it should also be assumed that the seller in the position of defendants would have been required to spend a similar amount if the defense had been tendered to the seller and had been accepted.
Whatever may be the correct rule as to whether a tender of the defense must be made before the expense of defense can be recovered, we conclude that there are circumstances in this case which would make recovery of such expense in the absence of tender unfair. The settlement which resulted from the efforts of Kennedy-Ingalls’ counsel in the James action has been held not to give Meissner and Associated full protection from liability on account of the injuries of James. The decision on an earlier appeal, reported at 5 Wis. (2d) 100, 92 N. W. (2d) 247, was that Smith,.the owner of a portion of James’ tort cause of action became subrogated, as a result of the settlement, to a part of Kennedy-Ingalls’ cause of action against Meissner and Associated for breach of warranty. It is most improbable that if Meissner and Associated had been participating in the defense, there would have been any settlement which did not dispose with finality of Smith’s rights against them arising out of the injury to James. In the absence of a tender to them of an opportunity to defend, it would be unjust to hold that the expense incurred by Kennedy-Ingalls in the defense and in negotiating the settlement was for the protection of Meissner and Associated.
Kennedy-Ingalls argues that the circuit court, in changing the answer with respect to the expense of defense, was relieving defendants of a stipulation without notice to Kennedy-Ingalls, and more than one year after the stipulation was made. Sec. 269.46, Stats. The terms of the stipula *392 tion are not included in the bill of exceptions. In the opinion filed by the court, it is said: “This amount was stipulated to by counsel as reasonable and as having been actually expended by the plaintiff for the purpose above stated, and upon said stipulation the court inserted in the verdict, in answer to question 14 (c), the amount so stipulated.” The court did not determine the facts to be other than as stipulated, but concluded as a matter of law that question 14 (c) should not have been included in the special verdict, and that this amount should not be included in the recovery.
By the Court. — Judgment affirmed. Plaintiff is not to tax printing costs for the portion of his brief entitled “Argument on Cross Appeal.”